## FULLER et al. v. SHARP et al.

No. 1760.   Decided March 5, 1908 (94 Pac. 813).

33     431
p33    458

WATERS AND WATER COURSES—APPROPRIATIONS—DAMS—INJUNCTION. Interference by defendants, prior appropriators of water, with the dam of plaintiffs, junior appropriators, by which water was diverted to plaintiffs' lands for irrigation, *held* properly enjoined, the evidence sustaining findings that plaintiffs had not diverted any water to which defendants were entitled as prior appropriators, even if a prior decree was *res judicata*, or showing that, as the dam was allowed to be maintained, as much water would reach defendants' land as though there were no dam.

STRAUP, J., dissenting.

APPEAL from District Court, Weber County; J. E. Booth, Judge.

Action by George A. Fuller and others against Milo Sharp and others.   Judgment for plaintiffs, and defendants appeal.

AFFIRMED.

*W. L. Maginnis* and *John E. Bagley* for appellants.

*J. N. Kimball, George Halverson,* and *C. C. Richards* for respondents.

McCARTY, C. J.

This action was brought by George A. Fuller, D. L. Colvin, and Virgil B. Stallings, as trustees of the Eden Irriga-

tion District, and as individuals suing on their own behalf and on behalf of said district and all the landowners therein, against Milo Sharp, Joseph Carver, and John Stevenson to enjoin them from breaking, or in anywise interfering with plaintiff's dam across the North Fork of Ogden river. Plaintiffs, in their complaint, among other things allege that in the year 1861 the predecessors in interest of the Eden Irrigation District, by means of a dam, diverted and appropriated, for irrigation, domestic, and culinary purposes, all of the waters flowing in the North Fork of Ogden river down to the point of such diversion; that the waters so appropriated have been continuously used by the landowners in the said district each and every season since said appropriation was made; that the amount of water so appropriated from the unappropriated waters of the North Fork of Ogden river is about thirty-two second feet. It is further alleged that on July 27, 1904, the defendants, without right, and against the will of, and without the consent of plaintiffs and the landholders in said district, entered upon the canal of the Eden Irrigation District at a point where the Eden dam turns the waters from the North Fork of Ogden river into the Eden canal, and turned the water from the said canal and dam down the channel of said North Fork, and that the water was thus thereby lost to said irrigation district and to the landholders thereof, to their damage, etc.; that defendants threaten to continue to so divert and run said water down the said channel of the North Fork of Ogden river unless restrained, etc. Milo Sharp and Joseph Carver answered admitting that they opened and removed the Eden dam at the time and in the manner alleged in the complaint, but justified as the agents and officers of Plain City Irrigation Company, which company, they alleged, had, by prior appropriation, acquired a title to the waters of North Fork superior to any right or claim acquired by the Eden Irrigation District. Joseph Stevenson answered admitting that he and the other defendants broke and removed the Eden dam, but justified as the agent of the Western Irrigation Company, a corporation, which company, he alleged, had acquired, by prior ap-

propriation, a right to the use of the waters of North Fork which was paramount to any right, title, or interest of plaintiffs in and to said stream. By stipulation, the Plain City Irrigation Company and the Western Irrigation Company were made parties defendant and it was also stipulated that the complaint of the plaintiffs should stand as a complaint against said companies and that the answer of Milo Sharp and Joseph Carver should stand as the answer of the Plain City Irrigation Company and that the answer of Joseph Stevenson should be considered and treated as the answer of the Western Irrigation Company. As a further defense the defendants allege that the questions and matters involved in this action were adjudicated by the district court sitting in Weber county on the 10th day of September, 1892, in an action wherein William Geddes and others, suing as trustees of the Plain City Irrigation Company, were plaintiffs and the Eden Irrigation District (plaintiff herein) and the predecessors in interest of the Western Irrigation Company and numerous other parties, appropriators of the waters of Ogden river, were defendants.

As conclusions of law in that case the court found: "That the first appropriator of water from a natural stream for beneficial purposes has a prior right thereto to the extent of such appropriation; that as between the parties who appropriated water from Ogden river as above found, their several rights took rank according to the several appropriations . . .; that the right of the several parties to this suit should be decreed to them, including amount and quantity according to the dates of appropriation and the capacity of the ditches constructed as are stated in the findings of fact." The decree, so far as material here, recites: "It appearing thereform (the findings of fact and conclusions of law) that the plaintiffs are entitled to the relief demanded as hereinafter decreed, it is ordered, adjudged, and decreed that the following named parties to this action are the owners herein stated, that is to say: North Ogden Irrigation Company. Ditch nine feet wide on top; eight feet wide on bottom; 2.5 feet

deep; velocity sixty feet per minute. Date of appropriation January 1, 1858. Plain City Irrigation Company, by its trustees. Ditch 12.8 feet wide on top; 7.5 feet wide on bottom; 3.2 feet deep and 0.12 feet fall per one hundred feet. Date of appropriation May 14, 1859. Eden Irrigation District, by its trustees. Ditch seven feet wide on top; seven feet wide on bottom; 1.33 feet deep and 0.64 feet fall per one hundred feet. Date of appropriation June 1, 1862. Harrisville (predecessors in interest to Western Irrigation Company), by its trustees. Ditch 12.8 feet wide on top; 7.5 feet wide on bottom; 3.5 deep and 0.12 feet fall per one hundred feet. Date of appropriation May 14, 1859. That each of the parties aforesaid . . . are decreed to be entitled to the exclusive use of so much of the waters of Ogden river as will flow in their said ditches, according to the dates of their appropriations; that the first in point of time in appropriating said water and constructing said ditches are entitled to the first right in the waters of said stream and so on successively to the last appropriator; that in case the water is insufficient in said stream at any time to fill all of said ditches, then those having the junior appropriations shall turn into the natural channel of the stream all of the water diverted by them until sufficient is turned into said stream to supply the ditches of any prior appropriators in point of time, and such junior appropriators and all persons acting in aid or assistance of them are hereby enjoined and restrained from diverting any part of the waters of said river from the natural channel thereof, except it be at such times and seasons as there may be a surplus of water in said river after supplying the ditches of all appropriators upon said stream whose appropriations were prior in point of time to said persons so enjoined."

In reply to the answers of defendants plaintiffs allege that from about the 15th day of June to the 1st day of October of each and every year since the Eden Irrigation District and its predecessors in interest constructed the Eden dam in the year 1862, and thereby diverted the water from the North Fork, there has not been sufficient water flowing in said stream

at the Eden dam to flow down the natural channel to Ogden river. And they further allege that no water, as they are informed and so charge the fact to be, "from the beginning of the world to this trial, during the irrigation season, could or did flow down the natural channel of said North Fork of Ogden river, or any fork or tributary thereof . . ., that during every such season the said North Fork of Ogden river becomes dry . . . from said (Eden) dam for a distance of over one mile below the same, and that none of the water used by said plaintiffs . . . in any of said irrigation seasons ever at any time does or can ever reach or flow to the main channel of said Ogden river, nor to the canals or ditches of the defendants."

The facts in the case, as disclosed by the record, are about as follows: The Eden Irrigation District is situated on the east side of the North Fork of Ogden river, and its dam (known as the "Eden Dam") turns the water from the North Fork into the Eden canal, from which is irrigated about 1,600 acres. North of the Eden Irrigation District is another district known as "Libert Irrigation District," which contains about 1,500 acres of irrigated lands, and which also gets its supply of water from the North Fork. The dam by which the Liberty Irrigation District diverts and turns the water from the North fork into its canal is about four miles above the Eden dam. Ogden Valley, in which these irrigation districts are situated, is about ten miles in length and from $3\frac{1}{2}$ to five miles in width, and is situated in the eastern part of Weber county. The Ogden river is formed by three branches, one of which flows through Ogden Valley from the north and is called the "North Fork," and one flows from the east and is called the "East Fork," and the other flows from the south and is called the "South Fork." The lands irrigated by defendants are from twelve to fifteen miles lower down on Ogden river and about 1,000 feet lower in altitude than the lands irrigated by plaintiffs, and are situated in Salt Lake Valley, which is separted from Ogden Valley by a range of mountains. The only outlet and drainage for the water of Ogden Valley and the irrigation districts therein located

is the Ogden Canyon through which flows the Ogden river. The land in the Eden Irrigation District, with the exception of an occasional wash or gully, is practically even, and slopes gradually from the northeast to the southwest. The land situated near the lower end of the district and a short distance north of the junction of the North and East Forks of Ogden river is known as bench land. The lower part of this land is marked by an abrupt break or steep descent for about forty or fifty feet. The lands below the break are referred to in the evidence as bottom lands. These breaks, or "bluffs," as they are called by the witnesses, extend along the southern part of the Eden Irrigation District and for a considerable distance up and along the east side of the North Fork. The evidence shows that the land in the Eden district is very porous, and is capable of absorbing a large quantity of water. First, there is about 2 1-2 feet of loam, and then alternate layers of sand, gravel, and clay. The clay is down about fifteen feet from the surface and is somewhat impervious to water. The evidence on the part of the respondents tends to show that this stratum of clay forms the bed of an underground reservoir which is gradually filled by the seepage and filtration of the early spring irrigation; that the water thus retained gradually by seepage and percolation finds it way into gullies and creeks which carry it into Ogden river at times when needed by appellants and other appropriators lower down on the river. In the early part of the irrigation season, known as the period of high water, which usually lasts in Ogden Valley until about the 1st day of June of each and every year, there is an abundance of water in Ogden river and its tributaries to supply the demands of both plaintiffs and defendants as well as the claims of all other appropriators who divert water from these streams for useful purposes. But during the period of what is commonly known as the low-water season, which usually commences in Ogden Valley in the early part of June and continues until the middle of November, there is not sufficient water in Ogden river and its tributaries to supply the necessary demands of the numerous appropriators who obtain their water from said streams for

irrigation and other useful purposes. The Eden Irrigation District, during the low-water season of each and every year since it commenced using water from the North Fork, has, with the exceptions hereinafter mentioned, maintained a tight dam across the channel of said North Fork, and diverted the water therefrom for irrigation purposes. In the year 1892 the Plain City Irrigation Company, one of the defendants herein, commenced an action in the Second judicial district court of Weber county, state (then territory) of Utah, against the Eden Irrigation District and numerous other parties who had appropriated and were using water from Ogden river and the tributaries thereof. A trial was had, and the decree hereinbefore mentioned and in part set out was duly entered. For several years immediately following the entry of said decree, whenever the Plain City Irrigation Company and other parties in Salt Lake Valley whose rights to the use of water from Ogden river had been adjudged to be prior in point of time and superior to those of the landowners of the Eden Irrigation District were in need of water for irrigation and other purposes, and there was not sufficient in the river to supply each of the claimants with the amount of water awarded him by the decree mentioned, the Eden Irrigation District, on demand of those appropriators, would open its dam and permit the water running in its canal to flow down the natural channel of the said North Fork. Plaintiffs however claim that whenever, in compliance with said demands, they have opened their dam and permitted the water to flow down the natural channel of North Fork, the bed of which is from ten to thirty feet in width, and consists of loose sand and gravel, the water would sink and disappear before it reached the living or running water which first appears in the channel about 1 -1-2 miles below the Eden dam. They further claim, and the court found: "That during the early irrigation season the plaintiffs, by means of said canal and branch ditches, divert and carry a large quantity of water from said North Fork of Ogden river on to the lands of the plaintiffs and other landholders in said district, and by abundant irrigation retard the flood waters thereof, while

there is sufficient water in said river to supply the needs of all parties using water from said river, and a large portion of the waters so used by the plaintiffs are again by percolation and seepage returned to said North Fork and Middle Fork of Ogden river and are delivered into the main channel of Ogden river at points below said dam, and above the points of diversion by either of the defendants, in time for use by the defendants during the irrigation season, and the low waters of said Ogden river are thereby increased from and above the amount there would be if all the water run down the natural channel of said North Fork of Ogden river, and that by the use of said waters by the plaintiffs and the other land-holders in said district the defendants are not injured or damaged in any manner, and if said waters are not so used by the plaintiffs, the same will be lost to the defendants." Upon the other hand appellants claim that if the waters of North Fork below the Liberty dam were permitted to flow down its natural channel and were not diverted therefrom by the Eden Irrigation District, there would be a steady, continuous, and unbroken stream from the Eden dam to Ogden river. And they further claim that when the water is diverted by the Eden Irrigation District and spread upon the lands of said district, it is lost to appellants forever and that no appreciable amount of the water so diverted and used finds its way back into the North Fork or into any of the other tributaries of Ogden river by percolation or otherwise.

Much evidence was introduced both by plaintiffs and defendants in support of their respective claims and theories respecting the effect irrigation in the Eden Irrigation District has had on the supply of water in Ogden river. Witnesses for plaintiffs testified that, prior to the time that water was first taken from the North Fork for irrigation, the entire stream, during the dry or low-water season, sank and disapeared before it reached Ogden river, and, with the exception of a few pools of standing water, the channel became dry for a distance of about 1 1-2 miles below the Eden dam. The evidence introduced by defendants tended to show that before any water was diverted for irrigation purposes there

was, during the low-water season, a continuous stream of
from seven to nine feet in the channel of North Fork at the
point where the Eden dam is located, and that at the lowest
point on the stream below the Eden dam there was a constant
flow of from two to 2 1-2 second feet. On August 6, 1903,
the year before this case was tried, the Eden dam was open-
ed, and from twenty-seven to thirty second feet of water (prac-
tically the entire stream) was permitted to flow down the
natural channel the balance of the season. On August 14,
8 days after the water was turned down the natural chan-
nel, there was 59-100 of a second foot that reached living
or running water. On September 23d, the water had de-
creased, and there was only 8.47 feet flowing past the Eden
dam, none of which reached the living water lower down the
channel, but sank and entirely disappeared about a mile be-
low the Eden dam. On September 4, 1904, and during the
progress of the trial, by order of the court, all the water from
the Eden Canal was permitted to flow down the natural chan-
nel for a period of two weeks. Measurements were made each
day by a competent civil engineer. These measurements
showed that 11.65 second feet was turned down the old chan-
nel and flowed 2,300 feet below the Eden dam the first day
and at the end of two weeks the water had reached a point
in the creek 2,800 feet below the Eden dam, leaving a space of
6,155 feet of dry channel from the point where the water
ceased flowing to running water farther down the creek. Dur-
ing the time the water was thus permitted to flow down its nat-
ural channel there was no perceptible increase in the waters of
Ogden river. The undisputed evidence shows that at times
when there is but nine or ten second feet of water flowing
into the canal of the Liberty Irrigation District, and the
channel of the North Fork is dry for a distance of about three
miles below the Liberty dam, there is flowing in the channel
at Eden dam thirty second feet of water. This water all
rises from the bottom and seeps from the sides of the creek
within a mile above the Eden dam. And the evidence with-
out conflict also shows that when the water is all turned from
the North Fork into the Eden Canal, and the channel of the

river is dry for a distance of 1 1-2 miles below the Eden dam, there is flowing into Ogden river from the North Fork from sixteen to twenty second feet of water, the larger portion of which the evidence shows to be seepage water. On July 29, 1903, the river bed below the Eden dam was dry, and there was flowing into Ogden river from this source 18.34 second feet; on September 23, there was 16.24 second feet; and on August 6, 1904, there was 20.25 second feet. Samuel Fortier, a civil engineer, testified that on July 10, 1894, he measured the various streams which flow into the different forks of Ogden river, and found flowing into Ogden Valley 154 second feet of water. He also on said date measured the water flowing into the different canals in the valley, and found there was in the aggregate 140 second feet used for irrigation purposes. He measured the amount of water in Ogden river where it leaves the valley and found it to contain 156 second feet. On August 17, same year, he again made measurements, and found flowing into the valley eighty second feet; seventy second feet used in the valley for irrigation; and 100 second feet flowing out of the valley.

The court found: (22) "That prior to the irrigation of the lands in the said Eden Irrigation District, to wit, prior to the year 1861, only three feet of the flow of the North Fork of Ogden River flowed below the point where the dam of the said Eden Irrigation District is thrown across the said North Fork; . . . and only 17.36 second feet of the flow of said water during the irrigation season now flows into said Ogden river from sources other than percolating and seepage, which arises from the irrigated lands of plaintiffs and other landowners in said Eden Irrigation District." (26) "That the defendants, the Plain City Irrigation Company and the Western Irrigation Company, are entitled to and are the owners of the use of the flow of the water in said North Fork of the Ogden river arising and flowing below the dam of the said Eden Irrigation District to an amount exceeding the flow at and above said dam, 20.36 second feet." As conclusions of law the court found: "That the plaintiffs and the other landholders in said Eden Irrigation District

are the owners of and are entitled, at all parts of the irrigation season, to the right to use from the 15th day of May to the 15th day of November of each and every year, of all the flow of the waters of the North Fork of Ogden river arising in said North Fork at and above said dam of the Eden Irrigation District at all times when the amount of water at such point of measurement exceeds the flow in said North Fork at and above said dam 20.36 second feet, and when the same does not, at said point of measurement, exceed said amount at said dam 20.36 second feet, then the plaintiffs are required to turn down into said North Fork sufficient water to make said amount at said point of measurement."

A decree was entered in conformity with the foregoing findings of fact and conclusions of law.

Appellants, defendants below, strenuously object to the foregoing findings of fact and conclusions of law, and to the decree entered thereon, and contend that they are not only unsupported by, but are contrary to, the evidence. Assuming, for the purposes of this case, that appellants are correct in their contention on this point, they are not in a position to successfully allege error because in the decree they are awarded a greater quantity of water than the preponderance of the evidence shows they are entitled to. Therefore the findings and decree, even though erroneous, are not prejudicial to the interests of appellants. The decree not only gives appellants all the water which the evidence tends to show rises in the natural channel of the North Fork below the Eden dam, but, in addition thereto, gives them three second feet of water, the amount which the court, in effect, found flowed down and through the entire length of the channel during the irrigation season prior to the irrigation of lands in the Eden Irrigation District. Whereas the evidence introduced by appellants shows that there was not to exceed 2.5 second feet of water flowing through the entire length of the channel, at least part of the season, during the low-water period prior to the time the Eden Irrigation District first diverted water from the North Fork. In fact, the great preponderance of the evidence tends to show that during the

low-water season the water flowed a short distance only below the point where the Eden dam is located. While there is some evidence of a negative character to the contrary, the great preponderance of the evidence tends to show that there is a large amount of seepage caused by the irrigation of land in the Eden Irrigation District; that this water finds it way during the irrigation season into the North and Middle Forks and thence into Ogden river; that in one stream alone, known as "Dry Hollow," there is 3.51 second feet, and in another 1 second foot, besides considerable quantities which come out from the sides and the base of the bluffs hereinbefore referred to, and flow directly into North and Middle Forks, and from there into the Ogden river.

Appellants, in their brief, say that "while during the certain dry periods it may not appear upon the surface at points above the Eden dam, still there would be a constant flowage of water down the stream either above or below the surface." And some of appellants' witnesses gave it as their opinion that this stream, when it sinks, flows along underneath the bed of the creek and then rises farther down the channel. While no doubt a portion of the stream, if it were permitted to flow down the natural channel past the Eden dam during low-water season, would, by percolation, eventually find its way into the Ogden river, we think that the great weight of the evidence tends to show that no appreciable amount would be saved to appellants. Thomas Clark, a witness for respondents, testified—and his testimony is not contradicted—that in the year 1901 he dug a well on his premises between the Eden Canal and the bed of the North Fork; that the well is forty-three feet in depth, and is situated about six hundred feet below the Eden dam, and about 150 feet from the canal, and three hundred feet from the North Fork; that the bottom of the well is about twenty feet lower than the bed of the North Fork and about thirty feet lower than the bottom of the canal; that whenever a tight dam is thrown across the channel, and all of the water turned into the Eden canal and kept there for a week or more, the well goes dry, and when the water is returned to its natural channel it soon reappears

in the well. This testimony, considered in connection with that given by the civil engineers who measured the stream each day during the time it was permitted to flow down the natural channel under the order of the court during the progress of the trial, tends strongly to show that, when the stream is permitted to flow past the Eden dam and down its natural channel during the low-water season, the portion that sinks spreads out for a considerable distance from the bed of the creek and is practically lost to both appellants and respondents. Therefore, assuming, as we have suggested, that the court erred in its distribution of the waters involved in this case, appellants are benefited rather than injured thereby, because the great preponderance of the evidence shows that under the decree they receive more water from North Fork during times of scarcity than they would get if the water were permitted to flow down the natural channel of said creek. And, as a legal proposition, it is immaterial whether appellants receive the amount they are entitled to through the waste gates of respondents' canal or through the natural channel. Therefore if respondents can, by turning the water into their canals, deliver to appellants the amount to which they are entitled and at the same time save to themselves the amount of water ranging from ten to thirty second feet, which the weight of the evidence shows is lost by absorption and evaporation when the water is permitted to flow down its natural channel, they ought to be permitted to do so. For it cannot be successfully claimed that appellants are deprived of any vested right so long as they receive the same amount of water through the waste gates of respondents' canals as they would if the water were allowed to flow down its natural channel. And, furthermore, it is the settled policy of the law of this state, and that of the entire arid region as well, to compel an economical use of the waters of the public streams and other natural sources of supply. In the case of *Union Mill & Mining Co. v. Dangberg* (C. C.), 81 Fed. 119, Judge Hawley, in the course of the opinion, says:

"It would be unjust and inequitable to compel farmers in the valley to allow the water to run down to the mills when the quantity of water was wholly insufficient to enable the complainant to run its mill with water power."

Continuing, he tersely, and, as we think, correctly states the general doctrine as follows:

"There must be a beneficial use before any protection can be invoked. No provisions should be contained in the decree which would result in depriving one party of the use of the water when the other party could make no beneficial use of it. This would amount to a destruction, instead of a protection, of the rights of the parties. In the appropriation of water, there cannot be any 'dog in the manger' business by either party, to interfere with the rights of others, when no beneficial use of the water is or can be made by the party causing such interference."

In the case of *Wiggins v. Muscapiabe Land & Water Co.*, 113 Cal. 182, 45 Pac. 160, 32 L. R. A. 667, 54 Am. St. Rep. 337, a question similar to the one under consideration was before the court, and, in the course of the opinion, it is said:

. "The plaintiff could under no circumstances be entitled to the use of more water than would reach his land by the natural flow of the stream, and, if he receives this flow upon his land, it is immaterial to him whether it is received by means of the natural course of the stream, or by artificial means. On the other hand, if the defendant is enabled by artificial means to give to the plaintiff all of the water he is entitled to receive, no reason can be assigned why it should not be permitted to divert from the stream, where it enters its land, and preserve and utilize the ten inches, which would otherwise be lost by absorption and evaporation."

. In *Beaverhead Canal Co. v. Dillon Electric Light & P. Co.*, 34 Mont. 135, 85 Pac. 880, the court said:

"Of course the court's finding that the waters of Rattlesnake creek flow into Beaverhead river at all times above the head of plaintiff's canal does not establish the fact that they will continue to do so during the irrigation season of every year hereafter; and if it should occur that Rattlesnake creek becomes dry below these springs and above the head of plaintiff's canal, at such times plaintiff could not complain if defendant Smith use these waters which otherwise would be lost."

The contention that the decree in the Geddes suit, hereinbefore referred to and pleaded by appellants as *res adjudicata* in this case, determined the particular questions herein involved is untenable. The pleadings in that case are not before us, therefore the only means we have of determining what the issues were are the findings of fact and the decree filed therein. There was no finding as to the amount or per cent. of evaporation and absorption in the stream below the Eden dam when it was allowed to flow down the natural channel during the dry or low-water season. Neither is there a finding at what stage of this particular stream respondents were required to turn it down the natural channel for the use of the appropriators below. Nor is there a finding that the stream, if permitted to flow past the Eden dam during the dry season, would, either by a surface or a subsurface flow, reach Ogden river in any appreciable amount, and thereby bring the stream at its lowest stage within the blanket or general provisions of the decree. In fact the decree in that case only gave to appellants water which would, if allowed to flow down the natural channel of North Fork, reach their headgates. And, as we have pointed out, no reference is made in the decree to the water of North Fork which the weight of the evidence shows is lost by evaporation and absorption when the stream is permitted to flow down the natural channel past the Eden dam during the dry or low-water season. It is conceded that appellants' appropriation of water from Ogden river was prior to that made by respondents from the North Fork. And it is also conceded that so long as the water of the North Fork will flow down the natural channel and into the Ogden river and is needed by appellants for irrigation and other useful purposes, the respondents have no right to deprive them of any part thereof. And this is what the court found and decreed in the Geddes suit. The decree in the case under consideration protects appellants in their rights as fixed by the decree in that suit, and compels respondents to deliver through their canal into Ogden river for appellants more water than appellants' own evidence shows would even-

tually reach there if the water were permitted to continually flow down the natural channel of North Fork.

The judgment is affirmed, with costs.

FRICK, J. (concurring).

I concur with the Chief Justice in the result reached by him. I desire, however, to briefly state the precise grounds upon which I rest my concurrence.

It appears from the record that the appellants interfered with the dam constructed by respondents in a certain stream by means of which water was diverted by them on to their lands for the purpose of irrigation. Such interference by appellants prevented the diversion of the water claimed by respondents. The respondents thereupon commenced this action to enjoin the appellants, and to prevent them from interfering with the dam and water rights claimed by respondents. The injunction was granted. The appellants justified their interference with respondents' dam and diversion of water principally upon two grounds: (1) That the water rights of the parties had been determined in a former action in which the amount of water to which appellants were entitled and their priority of right thereto had been adjudicated; (2) that respondents had interfered with appellants' prior rights and by means of such dam had and were diverting water which by the terms of the decree in the former action, was adjudged to belong to them. It is elementary that where one person justifies his acts of physical interference with the property or property rights claimed by and in possession of another the burden to establish the right to interfere is cast upon the person who claims the right to do so. The decree, the material parts of which are set forth in the opinion of the Chief Justice, simply establishes the priority of appellants' rights to the quantity of water to which they are entitled as prior appropriators. So far as the so-called Geddes decree is concerned, therefore the respondents could not be held to have interfered with its provisions unless they in some way diverted water to which appellants were entitled thereunder. There is abundant evi-

dence in the record to sustain the court's findings that the respondents had not diverted any water to which appellants were entitled as prior appropriators, and the respondents' dam did not interfere with appellants' rights. From this it necessarily follows that the question argued by counsel with regard to the conclusiveness of the former decree is not material. If appellants' rights, as established by the decree, were not invaded, it is of no consequence whether the decree is held conclusive or not. It further follows that if the respondents did not divert any water that belonged to the appellants, and appellants obtained all the water at their point of diversion to which they were entitled by virtue of their prior rights, or if they obtained all the water that would naturally and in any event flow down the stream to the point where they divert the water for use, then the respondents did not interfere with appellants' water or water rights, and hence appellants had no right to interfere with respondents' dam or means of diversion. Such interference was therefore unlawful, and the injunction preventing it is right.

Upon the question of the right of a junior appropriator to take water out of a stream at a point higher up the stream than the prior appropriator takes his water and which the junior appropriator diverts on to his land, and which water, it is claimed, by percolation is made available to the prior or lower appropriator. I express no opinion. In view of the finding of the court that the prior and lower appropriators' rights are not interfered with by the junior and upper appropriators, it is not necessary to pass upon the question. While the discussion of the Chief Justice upon the question to a certain extent is apposite and very interesting, it, in my judgment, is not necessary to pass upon that either way in this case. The question respecting the right to divert water flowing in a stream for irrigation by an upper and a junior appropriator, under the claim that the water so diverted would not flow down to the point of diversion of the prior appropriator, or, that, if it would flow, nevertheless the prior and lower appropriator obtains the use thereof through seepage and percolation, is one of compelling

importance in this arid region, and should not be conclusively settled until it is presented as the controlling question in a case and in the light of a thorough discussion by counsel.

I am constrained to further state that in this class of cases, where it appears from the record that the trial court, at the request of the parties and in their presence, made a thorough personal inspection of the streams and sources of water supply, and the points and manner of diversion, this court should be very cautious in setting aside or interfering with the findings of the trial court. While this is a proper rule to apply in any case, in my judgment it applies with special force in so-called water cases. While the findings and decree in some respects are not as clear or as satisfactory as they might be, still long range interference is more likely to create mischief than it is to correct errors.

For these reasons, I feel constrained to concur in the affirmance of the judgment.

STRAUP, J., dissenting.

I dissent. In 1892 the quantity of water which each of the parties to this action, as well as others, had appropriated and to which each was entitled, the priority of their respective appropriations, and the rights of all in and to the use of the waters in question, were defined and determined in an action brought for that purpose in the district court of the Second judicial district of the then territory of Utah. The judgment in that action, known as the Geddes decree, was not appealed from, nor was it reversed or modified. For more than twelve years it was regarded by the parties and treated by them as the basis upon which their respective rights in and to the use of the water was measured. In that action the defendants who were lower down the stream than the plaintiffs, were adjudged to be the first and prior appropriators of the waters of the stream. The plaintiffs' appropriations were adjudged to be subsequent and junior to that of the defendants. By the decree in that action it was further adjudged that in case the waters of the stream were at any time insufficient to supply water to all the parties as defined by the decree, those having junior appropria-

tions were required to turn into the natural channel of the stream all the water diverted by them until sufficient was turned into supply those who were adjudged prior appropriators; and all junior appropriators were enjoined and restrained from diverting any part of the waters of the stream from its natural channel except at such times and seasons as there might be a surplus of water in the stream after supplying the quantity of water awarded to the prior appropriators. The plaintiffs, who were several miles higher up the stream than the defendants, constructed and maintained a tight dam across the stream. The waters here in question are those of the North Fork of Ogden river across the channel of which the dam was constructed. At the time of the grievances alleged in this action the plaintiffs at their dam diverted all the waters from the channel of the North Fork. Thereupon the defendants removed the dam and turned the water back into the channel. Plaintiffs then commenced this action, not claiming any right founded on the former decree, nor complaining that the defendants had in any particular violated any of its provisions or invaded any of plaintiffs' rights as established by that decree, but alleging their prior right and ownership of the use of the water, and claiming the right to divert all the water from the channel at their dam, if necessary to supply the quantity of their appropriations, which was alleged to be thirty second feet, and that the action of the defendants in removing the dam and turning the water back into the channel were wrongful interferences with their rights. The defendants denied the material allegations of the complaint, alleged their prior appropriation and their prior right to the use of the water, and pleaded the action and judgment of 1892 as *res adjudicata*. The findings and decree of that action were pleaded in full. Those and other facts pleaded by them with respect to the plea in bar show that the respective rights of the parties to this action in and to the use of the waters, the time of their respective appropriations, the quantity to which each was entitled, and especially the circumstances under which the plaintiffs, as against the defendants, were entitled

to divert water from the channel and to use it, were determined and adjudicated. The trial court found all the facts with respect to the plea in bar, and as alleged in the several answers of the defendants, to be true. Notwithstanding such findings, the court treated the matters as at large, and made fresh findings defining the dates of the respective appropriations of the parties, the quantity of water appropriated by each, the amount which each was entitled to use, the priority of their respective rights, and the circumstances under which the plaintiffs could divert water from the channel, all based upon the evidence adduced at large, and as though no action with respect to such matters had ever been had and no such rights had ever been litigated or adjudicated. Upon such evidence the court, among other findings, made a finding (No. 1) "that prior to June, 1861 (that being prior to plaintiffs' appropriations), the defendants the Plain City Irrigation Company and the Western Irrigation Company have, by their grantors and predecessors in interest, appropriated all of the flow of the water of the North Fork of Ogden river for the purpose of irrigating the lands described and mentioned in the answer of the said Plain City Irrigation Company and in the answer of the said Western Irrigation Company." The court further found that the amount of water to which the defendants were entitled was 20.36 second feet, and that the appropriations of the defendants were prior in time to those of the plaintiffs. In these respects the court found as was found in the former action. It, however, further found (finding No. 25): "That the plaintiffs and the other landholders in said Eden Irrigation District and said district are the owners of the right to the use from the 15th day of May to the 15th day of November in each and every year all of the flow of the water of the North Fork of Ogden river arising in said North Fork at and above the dam of the said Eden Irrigation District." Finding No. 26: "That the defendants the Plain City Irrigation Company and the Western Irrigation Company are entitled to and are the owners of the use of the flow of the water in said North Fork of Ogden river arising and flowing below the dam of the said Eden Irrigation District

to an amount exceeding the flow at and above said dam 20.36 second feet." It will thus be seen that, notwithstanding the finding of facts that the defendants appropriated all of the waters of the North Fork, and that they were the first and prior appropriators, nevertheless the plaintiffs are given all the waters of the stream above the dam, while the defendants are only given the waters of the stream "arising and flowing below the dam," to an amount exceeding the flow at and above the dam 20.36 second feet. That is to say, if any water arises and flows in the stream below the dam after the plaintiffs have taken it all out at the dam, the defendants are entitled to it.

While the court, from all the evidence adduced, found that the defendants had appropriated all the waters of the North Fork, and that the appropriations of plaintiffs were subsequent to those of the defendants, nevertheless the court, in direct conflict with such finding, but in harmony with findings 25 and 26, decreed and adjudged "that the defendants the Plain City Irrigation Company and the Western Irrigation Company are entitled to and are the owners of the use of the water of the North and Middle Forks of the Ogden river arising and flowing below the dam" of plaintiffs "to an amount exceeding the flow at and above said dam 20.36 second feet," and that the plaintiffs were the owners, and were entitled at all times during the irrigation season from the 15th day of May to the 15th day of November in each and every year to the waters of the North Fork above the dam. The defendants were thereupon enjoined and restrained from in any manner interfering with plaintiffs' dam, or with the waters taken out of the stream and run in their canal. While the defendants are found to have been the first appropriators of all the waters of North Fork, they nevertheless are not given any ownership in and to the use of, or control over the waters of North Fork above the dam.

Such a conclusion seems to be based upon a supposed theory that by plaintiffs' taking all the water out of the stream at the dam and spreading it upon their lands, it will again seep back into the stream somewhere below the dam, and that the defendants, being a considerable distance below, are able in that

way to get the use of the water; and on the further finding made by the court that in low-water seasons the stream at the dam is so small that if the water were permitted to flow down the channel it would be absorbed by the soil or sink away before it reached the defendants, and thus would be lost not only to the defendants but to the plaintiffs as well. Much evidence was given by the parties pro and con in respect of these matters. With the merits or demerits of such a controversy I am not now concerned, for I think they were matters involved in the first litigation. I think they were then litigated and adjudged adversely to the plaintiffs. But whether directly litigated or not, the rule as to identity of issues is broad enough to conclude not only as to matters actually litigated, but as to every ground and all matters which might or could have been presented and determined under the issues made. The court in this action did not confine its inquiries to matters and things or changed conditions arising since the former decree, but, in the language of plaintiffs' replication inquired into and determined everything "from the beginning of the world to the time of the trial." The well-known maxim, "A thing adjudged makes white black; black white; the crooked straight; the straight crooked," was disregarded, and the court made that white which from all the evidence appeared to be white, and that which seemed crooked was made straight. That is to say, the former decree which adjudged that the plaintiffs were forbidden from diverting any water from the channel of the stream except after the defendants, as prior appropriators, had first been supplied, was not regarded as of consequence, for that the court heard the evidence "from the beginning of the world to the time of the trial," and therefrom found that the waters of the stream in low-water seasons never did course down the channel to the place where the defendants appropriated and took it out of the stream, and, in order that the water might not go to waste, he took all the waters of the stream at and above the dam from the defendants and gave it to the plaintiffs. I presume, if in the future the defendants may be able to convince another trial court that the water did course down the channel, they can get it back.

Until then they must content themselves with the theory that when all the water is taken out of a stream by junior and upper water users, and appropriated upon their lands and spread over large areas where it is evaporated and taken up by growing vegetation and absorbed by the soil, it will finally get back into the stream if lower water users and first appropriators have only the patience to wait and do not interfere.

Quite true, by other portions of the present decree it was adjudged that when the amount of water flowing in the North Fork measured, not at the dam, but at the confluence of the North and South Forks, several miles below the dam, "does not exceed the amount flowing at and above the dam of the said Eden Irrigation District (plaintiffs' dam) 20.36 second feet, the plaintiffs and said Eden Irrigation District shall turn from their canal or a lateral thereof so much of the waters of said North Fork of the Ogden river at such point as may be most convenient for the plaintiffs and economical for the conservation of water, into said North Fork below said district's dam, as will make the quantity of water at said point of measurement exceed the quantity flowing at and above said dam 20.36 second feet." But such portion of the decree does not modify the other portions adjudging the plaintiffs the owners of the use of all the waters at and above the dam and giving them the right to control and manage such waters. I am, however, unable to say just what the portion of the decree last above quoted means. It says that when the waters of the North Fork, measured at its confluence with the South Fork, does not exceed the amount flowing at and above the dam 20.36 second feet, then the plaintiffs shall turn from their canal into the North Fork so much of the waters of the North Fork as will make the quantity of water flowing at the point of measurement exceed the quantity flowing at and above the dam 20.36 second feet. That is to say now, if the quantity of water flowing at the dam is fifteen second feet, and at the point of measurement ten second feet, then the plaintiffs are required to turn such a quantity of water from their canal or a lateral into the channel of the North Fork below the dam as will make the ten feet exceed fifteen feet 20.36 second feet.

To do so would require the plaintiffs in such case to turn into the channel from their canal 25.36 second feet; that is, 25.36 second feet added to ten second feet, making 35.36 second feet, exceeds fifteen second feet 20.36 second feet. If the water at the point of measurement is five feet and at the dam twenty feet, plaintiffs would be required to turn in 35.36 second feet; and if there should be thirty second feet running at the dam and none at the point of measurement, then plaintiffs would be required to turn in 53.36 second feet. Such is the plain meaning which necessarily results from the unambiguous language employed, and is the only sense which can be given it. Nevertheless, to give it such a meaning leads not only to an absurdity but to an impossibility; for it is at once apparent that the plaintiffs cannot turn back into the channel a greater quantity of "waters of the North Fork" than was taken out by them or was coursing in the stream at the point of diversion. Furthermore, such a meaning renders this portion of the decree in conflict with other portions and makes it inconsistent with some of the findings. Undoubtedly the decree should be construed as a whole, and a construction should not be given a portion of it which leads to an absurdity or impossibility, or which renders it in conflict with other portions, unless it is unavoidable. Without doing violence to plain language and utterly disregarding its ordinary sense, I do not see how it is possible to harmonize the decree or to make it consistent with the findings. If the language employed is not given its ordinary meaning and the conclusion is reached that the court did not intend what the language used fairly imports, then we are forced to the position that the circumstances and conditions under which the plaintiffs are required to turn the water back into the channel for the use and benefit of the defendants are left uncertain and undefined, and in a condition which only breeds future contentions. However, as already observed I am not now much concerned with such matters, for I am of the opinion that the court was not at liberty to treat and adjudge the matters as at large as was attempted. It must be remembered that this is not an action to vacate or modify the former decree, or one where it is alleged or claimed

that the plaintiffs' rights as established by that decree were interfered with by the defendants. Plaintiffs' action was grounded on their allegations that they, as against the defendants, had the prior right and ownership of the use of the waters, and on their alleged claim that they had the right to divert all the waters from the channel at their dam. In addition to their general denials the defendants alleged their prior appropriation and prior right to the use of the waters, and pleaded the former action in bar. The court found all the facts in the answers with respect to the plea of *res adjudicata* to be true, and recognized the former decree as binding and operative. While the court with one arm maintained that the former decree should not be disturbed, with the other he proceeded to treat matters under the general issues at large, and made fresh findings with respect to them on the evidence adduced, and as though the matters had not theretofore been litigated. And now we are told that the defendants cannot complain because there is sufficient evidence to sustain the findings, and that the defendants got all the waters to which they are entitled as shown by the evidence. Where the matters to be adjudged at large, and the inconsistent findings and the uncertainty and indefiniteness of the decree to be disregarded, there might be force to the position. But I cannot escape the conclusion that the rights of the defendants as established by the former decree were invaded by the present decree. To me it is quite clear that the decrees cannot both stand. By the first decree the defendants were adjudged the first appropriators, and were given the prior right to the use of all the waters of the North Fork, and the plaintiffs were enjoined from diverting any of the waters from the channel except at such times and seasons as there might be a surplus of water after the defendants were fully supplied. By the present decree, notwithstanding the finding that the defendants were the prior appropriators of "all the flow of the water of the North Fork," nevertheless they are adjudged the owners of the use of the waters arising and flowing in North Fork below the dam, and plaintiffs the owners of the waters flowing in the stream at and above the dam, and are given the right to divert all the

waters from the channel at the dam, and the defendants enjoined from interfering with plaintiffs' dam and with the waters taken out by them and run in their canal. Two things could not be more opposite.

I think the judgment ought to be reversed.